UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JANET E. VOLK, Special Administrator
of the Estate of Vivian D. Wigen,

         Plaintiff,

v.

ROXANNE R. WIGEN and ESTATE OF
MYRON E. WIGEN, III,

         Defendants.

Case No. 18-CV-3485 (PJS/DTS)

ORDER

---

Suzanne W. Kvas, LUTTER, GILBERT & KVAS, LLC, for plaintiff.

Heather N. Hoecke for defendants.

Plaintiff Janet Volk ("Janet"), as special administrator of the estate of Vivian

Wigen ("Vivian"), brings claims on behalf of Vivian's estate against the estate of Myron

Wigen, III ("Mick") and Mick's widow, Roxanne.[1]  Janet challenges the validity of

certain inter vivos transfers from Vivian—as well as certain transfers from Vivian's

estate—to Mick and Roxanne.  Janet brings claims of breach of fiduciary duty, unjust

enrichment, constructive trust, fraudulent inducement, conversion, and liability under

Minn. Stat. § 524.3-1202.  Janet also seeks treble damages under Minn. Stat. § 523.22.

---

[1]For the sake of clarity, the Court refers to all members of the Wigen family
(including Janet Volk) by their first names.  No disrespect is intended.

This matter is before the Court on defendants' motion for summary judgment and Janet's partial motion for summary judgment. For the reasons that follow, defendants' motion is granted in part and denied in part. Specifically, the Court grants defendants' motion with respect to (1) all of Janet's claims that relate to the transfers of three parcels of farmland (Parcels 1, 3, and 4) and a certificate of deposit; (2) all of Janet's claims of fraudulent inducement; and (3) Janet's claim that Mick breached his fiduciary duties by accepting transfers in 2013 in excess of the statutory limit in Minn. Stat. § 523.24, subd. 8(2). The Court denies defendants' motion in all other respects and denies Janet's motion in its entirety.

## I. BACKGROUND

### A. Vivian

Vivian and her husband, Myron Wigen, Jr., had three children—Mick, Janet, and Jon. After Myron Jr. died in June 2004, Vivian became the sole owner of their townhome and four parcels of South Dakota farmland. Roxanne Aff. ¶ 10. Mick, who was a real-estate agent and the only one of the three children to live in the same town as Myron Jr. and Vivian, had helped Myron Jr. manage the farm property. Roxanne Aff. ¶ 12; Jon Aff. ¶ 5; Kirsten Aff. ¶ 8.

In September 2004, Vivian signed a power of attorney appointing Mick as her attorney-in-fact but prohibiting Mick from using the power of attorney to make

transfers to himself.  Kvas Aff. ¶ 2 & Ex. B.  The power of attorney was drafted by

defense counsel Heather Hoecke—who is Mick and Roxanne's daughter—and the

executed copy was placed on file at Vivian's bank.  Kvas Aff. ¶¶ 1–2 & Ex. B.

Defendants contend that Vivian actually signed two powers of attorney on the

same day and that the second one, also drafted by Hoecke, permitted Mick to make

transfers to himself.  *See* Hoecke Aff. ¶ 1 & Ex. 1.  That is almost surely not true.  The

signatures of both Vivian and the notary on these two documents appear to be identical

(suggesting that one document was created by photocopying the other).  *Compare* Kvas

Ex. B *with* Hoecke Ex. 1.  Moreover, in the version that purportedly gives Mick the

authority to make gifts to himself, both the checkbox next to language permitting such

gifts and the checkbox next to language prohibiting such gifts are marked, with the

marking in the "prohibition" checkbox appearing as though someone attempted to

erase it or scratch it out.  Hoecke Ex. 1.  Finally, as Janet notes, the notary whose

signature appears on both versions worked at Vivian's bank, where the version

prohibiting Mick from making gifts to himself was kept on file.  Janet Supp. Aff. ¶ 2;

Kvas Aff. ¶ 2.  Notably, though, the bank did not possess a copy of the version giving

Mick the authority to make gifts to himself.  In other words, the version granting Mick

authority to make transfers to himself is almost certainly an altered copy of the original.

Further strengthening this inference, an unexecuted copy of this same power of

attorney, obtained from Hoecke's former law firm, is drafted to *prohibit* Mick from making transfers to himself.  Kvas Aff. ¶ 1 & Ex. A.

At some point after her husband's death, Vivian decided to sell the four parcels of South Dakota farmland, and she asked Mick to handle the sales.  Jon Aff. ¶¶ 3, 5; Roxanne Aff. ¶ 12.  In September 2007, right before Vivian began disposing of the farm property, she signed another power of attorney that again appointed Mick as her attorney-in-fact.  Hoecke Aff. ¶ 2 & Ex. 2.  Like the original power of attorney, the 2007 version was drafted by Hoecke, but unlike the original power of attorney, the 2007 version authorized Mick to make transfers to himself.  Hoecke Aff. Ex. 2.

Over the course of the next four years, Vivian disposed of the four parcels of farmland, with Mick selling two of them to a third party named John Green (in 2007 and 2008, respectively) and Vivian deeding two of the parcels to Mick and Roxanne (in August 2011).  In 2013, Green paid Mick a total of $225,394 in rent and mortgage payments that were owed to Vivian on one of the parcels.  Of this amount, Mick paid Vivian $4,894 (which represented a portion of the rent payment) and kept the rest for himself.  According to defendants, Vivian wanted Mick to keep the mortgage payment.

As to Vivian's other major assets:  In September 2008, Vivian executed a quitclaim deed giving her townhome to Mick and Roxanne, although she continued to live in the townhome until shortly before her death.  And in July 2009, Vivian gave

Mick $75,000 that she had held in a certificate of deposit.  All told, Vivian transferred over $900,000 in cash and property to Mick; Roxanne was a direct (joint) recipient of over $600,000 of those transfers.  Janet Aff. ¶ 13.  The details of each transfer, as well as the disputed transfers from Vivian's estate, are described below in chronological order.

Sometime in January or February of 2011—about six or seven months before Vivian deeded any farmland to Mick and Roxanne—Janet asked Vivian whether Vivian had transferred farmland to Mick.  Janet Aff. ¶ 8.  Vivian said several times that she "would never do that."  Janet Aff. ¶ 8.

Several years later, in November 2014, Janet noticed that Vivian was writing a large check to Mick.  Janet Aff. ¶ 2.  When questioned, Vivian said that she was reimbursing Mick for paying her property taxes, but could not explain why Mick was paying them.  Janet Aff. ¶ 2.  Janet did some investigation and discovered that Vivian's townhome had been transferred to Mick and Roxanne in 2008.  Janet Aff. ¶ 3.  Shortly afterward, in December 2014, Vivian revoked the September 2004 power of attorney and appointed Mick and Janet as joint attorneys-in-fact.  Janet Supp. Aff. ¶ 3 & Exs. A, C.  Janet later contacted the relevant counties in South Dakota and learned of the transfers of farmland to Mick and Roxanne.  Janet Aff. ¶ 4.

Around this same time, Vivian was suffering dizziness and had a pacemaker implanted.  Jon Aff. ¶ 12.  In November 2014, Jon moved back to Hutchinson to live

with Vivian because she needed additional care.  Jon Aff. ¶¶ 12–13.  Mick, Roxanne, and Vivian's granddaughters also assisted Vivian during this time; however, she mostly took care of herself, handled her own finances, and made her own decisions.  Jon Aff. ¶ 14.

In January 2015, Janet and Vivian met with Janet's legal counsel, who showed Vivian the 2008 quitclaim deed for her townhome.  Janet Aff. ¶ 9.  Vivian became upset, pushed the deed away, and said multiple times that no one was going to take her out of her home.  Janet Aff. ¶ 9.  Around the same time, in response to a request for an accounting of Vivian's assets, Mick left a voicemail for Janet's attorney in which he made references to Vivian paying taxes and utilities for "her" home.  Janet Aff. Ex. G.[2] Sometime in May 2015, after Janet showed Vivian legal correspondence questioning Mick about the farmland transfers, Vivian became upset and insisted that she did not remember signing any of the deeds transferring the farmland.  Janet Aff. ¶ 10.

In July 2015, Janet petitioned to have a conservator appointed for Vivian.  Kvas Aff. ¶ 17 & Ex. R.  At the hearing on the petition, Janet testified briefly concerning her discovery that Vivian had quitclaimed her townhome to Mick and Roxanne but did not seem to be aware that she had done so.  Kvas Aff. Ex. R at 7.  Vivian and her children all agreed that a conservator should be appointed for Vivian.  Kvas Aff. Ex. R at 4–5, 12–13.

---

[2]Janet's affidavit incorrectly identifies the transcript of this call as Exhibit F. *See* Janet Aff. ¶ 12.

The court granted Janet's petition to appoint a conservator, finding that Vivian "has no understanding of her assets or finances," that she "is vulnerable to the influence of [Mick] and has previously been persuaded to follow his direction," and that "[s]ubstantially all of [her] assets have been transferred to [Mick]."  Kvas Aff. ¶ 17 & Ex. S.

Less than a year later, the appointed conservator petitioned to terminate the conservatorship and restore Vivian to capacity.  Hoecke Aff. ¶ 12 & Ex. 12 at 3.  At the hearing on the petition, the conservator told the judge that Vivian was competent to handle her own affairs, stating,

> As a matter of fact, she has been handling her own financial affairs from the very beginning.  She was told at the time that she would be able to have her checkbook and—and do her own financial.  And I have met with her and we've reviewed the—her checkbook and her bank statements, and there's never been a concern.  She's fully capable of handling it at this time.

Hoecke Aff. Ex. 12 at 4.  The court granted the motion on July 7, 2016.  Hoecke Aff. ¶ 5 & Ex. 5.

In October 2017, Vivian was diagnosed with dementia and shortly thereafter was admitted to a hospital and then to a nursing home.  Hoecke Aff. ¶ 26 & Ex. 26; Roxanne Aff. ¶ 38; Jon Aff. ¶ 20.  Vivian died on December 28, 2017.  Roxanne Aff. ¶ 38.  At the time of her death, Vivian had approximately $1,500 remaining in her checking account.

Janet Aff. ¶ 7.  Medical Assistance had paid for a portion of her nursing-home care.

Janet Aff. ¶ 14.

Vivian's will, executed in December 1989, devised her estate to her husband and, in the event that he predeceased her, granted her children equal shares in any residual estate.  Hoecke Aff. ¶ 30 & Ex. 30 at 2.

### B.  *Mick*

Mick and Roxanne lived in the same town as Vivian.  Roxanne Aff. ¶ 2.  At the time of his father's death in 2004, Mick had suffered a stroke and was in the hospital. Roxanne Aff. ¶¶ 6–9.  While Mick was hospitalized, doctors discovered that he had heart problems and he underwent surgery to implant a defibrillator.  Roxanne Aff. ¶ 7.

Following this surgery, Mick's health remained stable until 2010, at which point his pacemaker began to trigger.  Roxanne Aff. ¶¶ 10, 18.  For the next few years, Mick suffered frequent shocks, which led to numerous emergency hospital visits and limited his ability to work.  Roxanne Aff. ¶¶ 18–23, 26.  In November 2012, Mick had open-heart surgery to implant a Left Ventricular Assist Device (essentially a heart pump); he returned home in January 2013 after extensive rehabilitation and afterwards was frequently in and out of the hospital.  Roxanne Aff. ¶¶ 26–27, 31.

In 2013, Mick was placed on the heart-transplant list.  Roxanne Aff. ¶ 33.  In 2015, after Mick's condition worsened, he was accepted into the transplant program at Baylor

University in Dallas and received a new heart in October; he remained in Dallas until the following January.  Roxanne Aff. ¶¶ 33–36.  Throughout this time, Vivian repeatedly expressed concern about and offered to help with Mick's medical bills. Roxanne Aff. ¶¶ 20, 22, 28, 30.

Beginning in September 2019, Mick's health began to worsen, and he died on February 1, 2020.  Roxanne Aff. ¶ 42.

### C.  Disputed Transfers

The challenged transfers are as follows (set forth in chronological order):

### 1.  Parcel 1

On September 25, 2007, Mick, acting as attorney-in-fact for Vivian, executed a warranty deed to transfer a parcel of farmland in Grant County, South Dakota ("Parcel 1") to John Green.  Hoecke Aff. ¶ 6 & Ex. 6.  The power of attorney on file with the deed is the altered 2004 version that authorizes Mick to make transfers to himself. Hoecke Aff. Ex. 6.  From the sale proceeds, Vivian distributed $35,000 to each of her children.  *See* Hoecke Aff. ¶ 28 & Ex. 28 ¶ 2 (admitting that Vivian gave an unspecified amount of money to Janet as a result of sales of farm property); Jon Aff. ¶¶ 6–7 (stating that he would receive money as his mother sold portions of the farm property, once received $35,000, and believed his siblings received checks in the same amount).

2.  Townhome

In the summer of 2008, Mick and Roxanne had a discussion with Vivian about her finances and health and discovered that Vivian did not have either long-term-care insurance or life insurance.  Roxanne Aff. ¶ 15.  As a result of this discussion, Vivian agreed to transfer her townhome to Mick and Roxanne via quitclaim.  According to Roxanne, Vivian made this decision "so she could accumulate the years required to go on Medicaid" in order to "pay for her entire nursing home and health issues in the future should it be needed."  Roxanne Aff. ¶ 15.  Also according to Roxanne, Vivian made it clear that she wanted to remain in the townhome and continue to pay all of the bills.  Roxanne Aff. ¶ 15.  And also according to Roxanne, Vivian said that, upon her death, she wanted Mick and Roxanne to have the townhome because of all of the work that Mick was doing for her.  Roxanne Aff. ¶ 15.

Vivian executed a quitclaim deed transferring title to her townhome to Mick and Roxanne in September 2008.  Hoecke Aff. ¶ 24 & Ex. 24.  In December 2008, Mick and Roxanne used the townhome to partially secure a $176,000 mortgage loan on another parcel of real estate.  Kvas Aff. ¶ 16 & Ex. Q; *compare* Hoecke Ex. 24 (legal description of townhome) *with* Kvas Ex. Q (legal descriptions of properties securing mortgage).  Vivian remained in the townhome until she moved to a nursing home about six weeks before her death.  Roxanne Aff. ¶¶ 38–39.

3.  Certificate of Deposit

Vivian had a $75,000 certificate of deposit ("CD") at Citizens Bank & Trust Co. that listed her three children as "pay on death" beneficiaries.  Janet Aff. ¶ 11 & Ex. D. On July 16, 2009, the day it matured, the CD was cashed out.  Janet Aff. Ex. D. Although the parties do not identify who cashed out the CD, the signature authorizing the withdrawal appears to be Mick's.  *Compare* Janet Aff. Ex. D at 1 (signature on bottom right requesting withdrawal) *with* Kvas Aff. ¶ 2 & Ex. B at 3 (Mick's specimen signature on the power of attorney on file at the bank).  The bank issued a $75,000 check to Vivian. Janet Aff. Ex. D at 3.  Vivian endorsed the check, and Mick then deposited the check into his own bank account.  Janet Aff. ¶ 11 & Exs. D at 3, E.

4.  Parcel 3

On August 9, 2011, Vivian executed a warranty deed to transfer a parcel of farmland in Codington County, South Dakota ("Parcel 3") to Mick and Roxanne.[3] Hoecke Aff. ¶ 15 & Ex. 15.  In November 2012, Mick and Roxanne sold the parcel to Green for $273,000.  Hoecke Aff. ¶ 16 & Ex. 16.

---

[3]There is some discussion in the complaint and the briefing about a 2009 AgStar mortgage on this property that Mick signed for both himself and as attorney-in-fact for Vivian.  *See* Hoecke Aff. ¶ 17 & Ex. 17.  At oral argument, however, Janet clarified that this mortgage is not part of her claim.

In April 2013, Mick deposited $81,538.36 into Vivian's checking account and Vivian distributed $20,000 each to Janet and Jon.[4]  Hoecke Aff. ¶¶ 8, 18 & Ex. 8 at ¶ 2(b), Ex. 18; Jon Aff. ¶ 8.  Defendants contend that this represents proceeds from the sale of Parcel 3; Janet contends that the money derives from the sale of hay on the farmland. Hoecke Aff. Ex. 8 at ¶ 2(b).

### 5.  Parcel 4

Also on August 9, 2011, Vivian executed a warranty deed to transfer a parcel of farmland in Grant County ("Parcel 4") to Mick and Roxanne.  Hoecke Aff. ¶ 19 & Ex. 19. In February 2012, Mick and Roxanne sold this parcel to Green for $230,000.  Hoecke Aff. ¶ 20 & Ex. 20.

### 6.  Final Mortgage and Rent Payments for Parcel 2[5]

In October 2008, Mick, acting as attorney-in-fact for Vivian, executed a warranty deed transferring a parcel of farmland in Codington County ("Parcel 2") to John Green. Hoecke Aff. ¶ 9 & Ex. 9.  The deed was recorded in Codington County along with a

---

[4]The Court notes that the checks in the record from Mick are payable to "Citizens Bank," where Vivian had an account.  *See, e.g.*, Hoecke Aff. Exs. 13, 14, 18; Janet Aff. ¶ 5. The attached deposit slips do not, so far as the Court can tell, indicate the owner of the account into which the checks were deposited, but Janet does not appear to dispute that these checks were, in fact, deposited into Vivian's account.

[5]Defendants refer to this tract as "Parcel 2" because it was the second piece of farmland to be sold.  Janet does not challenge the initial sale of Parcel 2, however; instead, she challenges the mortgage and rent payments made to Mick in 2013. Chronologically speaking, then, these are the last of the disputed inter vivos transfers.

-12-

copy of the altered 2004 power of attorney authorizing Mick to make transfers to himself.  Hoecke Ex. 9; Kvas ¶ 3 & Ex. C.

Green paid $581,000 for the parcel.  Hoecke Aff. ¶ 10 & Ex. 10.  Green made an initial payment of $226,908.79 and executed a mortgage for $226,000; the remainder of the purchase price went to pay off an existing mortgage and to cover various closing expenses and property taxes.  Hoecke Aff. Exs. 10, 11; Kvas Aff. ¶¶ 5–6, 8 & Exs. D, E, G.  Vivian gave each of her children approximately $60,000 of the initial payment.  *See* Jon Aff. ¶ 8 (Jon received approximately $60,000 at an unspecified time and believes his siblings received similar checks); Hoecke Aff. Ex. 12 at 15 (Jon testifying that all the children received money and that Jon received approximately $60,000 at an unspecified time); ECF No. 93 at 7 n.4 (plaintiff's memorandum noting that Vivian gave each of her children approximately one-fourth of the down payment).

The final mortgage payment was due on November 1, 2013, Kvas Aff. Ex. E, and in lieu of interest, Green was supposed to pay annual rent, Kvas Aff. ¶ 7 & Ex. F; *see* Hoecke Aff. Ex. 10 ¶ 4.  On April 2, 2013, JRG Farms Inc. issued a $8,894 check to Mick for "2013 rent"; a few days later, Mick deposited the check in his and Roxanne's joint Wells Fargo checking account.[6]  Kvas Aff. ¶ 9 & Ex. H.  The same day that he deposited

---

[6]Although the rent check was issued by JRG Farms Inc. rather than Green himself, defendants do not dispute that it is from Green and represents the 2013 rent that was due to Vivian for Parcel 2.

the check, Mick wrote a check to Vivian for $4,894 with the notation "2013 Rent."

Hoecke Aff. ¶ 14 & Ex. 14.

On November 19, 2013, Green made the final mortgage payment with a $216,500

cashier's check made out to Mick.  Kvas Aff. ¶ 10 & Ex. I.  Mick deposited this check

(less $500 that he took in cash) in his and Roxanne's joint Wells Fargo checking account.

Kvas Aff. ¶ 14 & Exs. M, N.  On the same day that he received the $216,500 check, Mick,

acting as attorney-in-fact for Vivian, signed a satisfaction of mortgage for the Green

mortgage.  Kvas Aff. ¶ 11 & Ex. J.  The document, along with an affidavit from Mick

affirming that he still had power of attorney, was later filed in Codington County.

Second Hoecke Aff. ¶ 1 & Ex. 31; Kvas Aff. ¶ 12 & Ex. K.

### 7.  Post-Death Transfers

After Vivian's death, Mick used an Affidavit of Collection to retrieve the

approximately $1,500 remaining in Vivian's checking account.  Janet Aff. ¶ 7 & Ex. A.

Later, Roxanne used a similar affidavit to deposit a $126.93 refund check payable to

Vivian.  Janet Aff. ¶ 7 & Ex. B.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

-14-

law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

### B.  The Parties' Motions

As noted, Janet brings claims of breach of fiduciary duty, unjust enrichment,

constructive trust, fraudulent inducement, and conversion.[7]  Although these are

disparate legal theories, they for the most part[8] require a showing of wrongdoing[9] and

---

[7]Janet also brings a claim for liability under Minn. Stat. § 524.3-1202 for the post-death transfers and seeks treble damages under Minn. Stat. § 523.22 in connection with Mick's collection of the final mortgage payment for Parcel 2.  The Court discusses these claims below.

[8]The exception is Janet's claim that in 2013 Mick breached his fiduciary duties as an attorney-in-fact when he accepted a gift larger than the limit set forth in Minn. Stat. § 523.24, subd. 8(2).  The Court discusses this claim below.

[9]*See Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019) ("A breach of fiduciary duty claim consists of four elements: duty, breach, causation, and damages."); *Cady v. Bush*, 166 N.W.2d 358, 361–62 (Minn. 1969) ("The theory of unjust enrichment . . . has been invoked in support of claims based upon failure of consideration, fraud, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another."); *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 837 n.3 (Minn. 2005) ("Constructive trusts are designed to correct abuses of fiduciary relationships and force a conveyance to prevent unjust enrichment."
(continued...)

-15-

are all based on the same allegations of fraud and undue influence.  Janet bears the

burden to prove these allegations.[10]  With these general legal principles in mind, the

Court addresses the parties' motions as they relate to each individual transfer.

### 1.  Parcel 1

Defendants move for summary judgment with respect to all claims relating to

Parcel 1, the portion of farmland sold to John Green in September 2007.  As described

above, Mick effected that sale by signing the warranty deed as Vivian's attorney-in-fact

---

[9](...continued)
(citation and quotation marks omitted)); *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764
N.W.2d 359, 368 (Minn. 2009) (claim of fraudulent inducement requires, among other
things, proof of a knowingly or recklessly false representation made with the intent to
induce reliance thereon); *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App.
2003) ("Conversion occurs where one willfully interferes with the personal property of
another without lawful justification, depriving the lawful possessor of use and
possession." (citation and quotation marks omitted)).

[10]*Cf. Murray v. Harvey Hansen-Lake Nokomis, Inc.*, 360 N.W.2d 658, 660–61 (Minn.
Ct. App. 1985) (affirming finding that plaintiff failed to meet his burden of proof on a
claim for breach of fiduciary duty); *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544
N.W.2d 302, 306 (Minn. 1996) ("To establish an unjust enrichment claim, the claimant
must show that the defendant has knowingly received or obtained something of value
for which the defendant in equity and good conscience should pay." (citation and
quotation marks omitted)); *Valspar Refinish, Inc.*, 764 N.W.2d at 368 (listing elements that
the defendant "must prove" to establish its counterclaim of fraudulent inducement);
*Lanners v. Royal Ag Serv., Inc.*, No. C0-97-234, 1997 WL 471372, at *2 (Minn. Ct. App.
Aug. 19, 1997) ("the plaintiff in a conversion action bears the burden of establishing the
alleged converter's actions were without legal justification" (citation and quotation
marks omitted)); *see also McKinley v. McKinley*, No. A08-0245, 2009 WL 749306, at *3
(Minn. Ct. App. Mar. 24, 2009) ("Gifts from parent to child are presumed to be valid,
and the burden is on the party challenging the gift to prove the gift is somehow
invalid.").

and Vivian distributed $35,000 to each of her children from the sale proceeds.  The only

fact that could raise an inference of fraud is that the power of attorney filed with the

deed is the altered version that authorizes Mick to make transfers to himself.  *See*

Hoecke Aff. Ex. 6.  Mick did not use that self-gifting authority to effect this transaction,

however, and there is no dispute that he otherwise had authority as Vivian's attorney-

in-fact to sell to a third party.  The Court therefore grants defendants' motion for

summary judgment on all claims relating to Parcel 1.

### 2.  Townhome

Defendants move for summary judgment on all claims relating to Vivian's

transfer of her townhome to Mick and Roxanne in September 2008.  Janet alleges that

Vivian was coerced or fraudulently induced to sign the quitclaim deed.  Janet points to

the conversation leading to the transfer, in which Mick and Roxanne convinced Vivian

to transfer the home in order to become eligible for Medicaid in the distant future;

Vivian's later confusion concerning why she was reimbursing Mick for property taxes;

the order placing Vivian under conservatorship, which found that she was vulnerable

to Mick's influence; Vivian's statement that no one would take her out of her home; the

voicemail Mick left for Janet's attorney in 2015 in which he referred to Vivian's home as

though she still owned it; and the fact that, just a few months after Vivian signed the

quitclaim deed, Mick and Roxanne used the townhome to secure a $176,000 mortgage loan with which they purchased additional real estate.

This evidence is not sufficient to establish fraudulent inducement.  While the justification for the transfer appears implausible (given the amount of the assets that Vivian owned at the time), Janet has not identified any statement by Mick or Roxanne that constitutes a "false representation . . . about a past or existing material fact susceptible of knowledge." *Valspar Refinish, Inc.*, 764 N.W.2d at 368.  Even if Mick's statement referring to the home as Vivian's could be considered fraudulent, that statement could not have induced the transaction, as it came years later.  The Court therefore grants defendants' motion on Janet's claim that either Mick or Roxanne fraudulently induced Vivian to transfer her townhome.

Turning, now, to Janet's claim that Mick and Roxanne exercised undue influence: To set aside the transfer on the basis of undue influence,

> the evidence must establish not only that influence was exerted, but also that the influence was so dominant and controlling of the influenced party's mind that, in making the contract, the influenced party ceased to act of his or her own free will, becoming "a mere puppet of the wielder of that influence." *See In re Estate of Congdon*, 309 N.W.2d 261, 268 (Minn. 1981) (involving  undue influence over testator when drafting will).  Whether conduct resulted from undue influence involves the weighing of factors, including whether the third-party influencer had the opportunity to exercise influence; whether the third-party influencer actively participated in the transaction; whether the

-18-

transferor and third-party influencer had a confidential
relationship; and whether there was an unreasonable or
unusual disposition of property.

*Nelson v. Holland*, 776 N.W.2d 446, 451–52 (Minn. Ct. App. 2009) (citation omitted).

Whether conduct is the result of undue influence is usually a question of fact and the

party asserting undue influence bears the burden of proof. *In re Estate of Horton*,

No. A18-1477, 2019 WL 3000756, at *3 (Minn. Ct. App. July 1, 2019).

Considering the relevant factors, the Court finds that there is a genuine dispute

of material fact concerning whether Mick and Roxanne exerted undue influence over

Vivian.  Most significantly, Mick and Roxanne were directly involved in procuring the

transaction and their rationale for the transfer makes no sense given that Vivian—who

had roughly a million dollars in assets at the time—had no need to impoverish herself

merely to become Medicaid eligible (and was nowhere near Medicaid eligibility even

after transferring her townhome).  In addition, Mick and Roxanne's use of the

townhome as collateral to purchase additional real estate just a few months after Vivian

signed the quitclaim deed casts doubt on the veracity of their stated rationale for the

transfer.  The timing suggests that their desire to access the townhome's equity was the

real reason that they wanted Vivian to sign it over to them.  And by treating the

townhome as theirs to encumber while Vivian was still alive, Mick and Roxanne acted

inconsistently with defendants' current claim that Vivian intended for Mick and

Roxanne to have the townhome upon her death.  Roxanne Aff. ¶ 15.

With respect to the second factor, it is undisputed that, as Vivian's attorney-in-

fact, Mick was a fiduciary.  *State v. Campbell*, 756 N.W.2d 263, 271 (Minn. Ct. App. 2008)

("A fiduciary relationship is implicit in the creation of a POA.").  Because Vivian relied

on Mick to manage and sell the farm property, a factfinder could also conclude that

Mick and Vivian had a confidential relationship even if the factfinder disregarded the

power of attorney.  *Cf. Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985) ("A

fiduciary relationship exists when confidence is reposed on one side and there is

resulting superiority and influence on the other; and the relation and duties involved in

it need not be legal, but may be moral, social, domestic, or merely personal." (citation

and quotation marks omitted)).

In addition, although Mick did not use the power of attorney to effect this

transaction, his status as attorney-in-fact is nevertheless relevant.  A factfinder could

find that Mick altered the power of attorney and thus that he intended to steal from his

mother, which would bolster an inference that he used undue influence to obtain her

townhome.  True, this chain of inferences is undermined by the fact that, in 2007, Vivian

executed another power of attorney that authorized Mick to make gifts to himself.  But

it is not clear why this later power of attorney does not show up in any of the official

-20-

records of the disputed transactions, and it is also not clear why it was not mentioned in the December 2014 revocation of Mick's power of attorney. *See* Janet Supp. Aff. Ex. A.

Finally, a factfinder could conclude that the disposition of Vivian's home was unreasonable or unusual. *See Norlander v. Cronk*, 221 N.W.2d 108, 112 (Minn. 1974) ("[U]ndue influence might be inferred from a disposition of property in favor of the ones who had an opportunity to influence, while others who would be the natural recipients of a share in the property were ignored." (citation and quotation marks omitted)).

Defendants rely heavily on the fact that Vivian signed the quitclaim deed herself. Vivian remained in possession of the home, however, and defendants claim only that she intended for Mick and Roxanne to have the home after her death. As a result, this transfer does not appear to meet the elements of an inter vivos gift. *See Kiecker v. Estate of Kiecker*, 404 N.W.2d 881, 883 (Minn. Ct. App. 1987) ("To constitute a valid gift inter vivos, the donor must deliver the property to the donee, or to someone for him, with intent to vest title in the donee, and without reserving any right to reclaim the property."). This sets the townhome on a different footing from other transfers that Vivian also effected herself and undermines the probative value of Vivian's signature on the deed as evidence of her actual intent. For these reasons, the Court holds that a

factfinder could determine that Mick and Roxanne exercised undue influence over
Vivian in order to obtain her signature on the quitclaim deed.

Defendants argue that Janet's claims of breach of fiduciary duty, unjust
enrichment, and conversion are barred by the six-year statutes of limitation applicable
to such claims.  *See* Minn. Stat. § 541.05, subd. 1(5).  It appears that undue influence may
operate to toll the limitations period, however.  *Cf. Howard v. Farr*, 131 N.W. 1071, 1073
(Minn. 1911) (calling undue influence "a species of fraud" and holding that the statute
of limitations began running when the decedent's daughter, the real party in interest,
could have discovered the facts allegedly constituting fraud or undue influence through
reasonable diligence); *cf.* Minn. Stat. § 541.05, subd. 1(6) (fraud claims do not accrue
"until the discovery by the aggrieved party of the facts constituting the fraud").

In any event, defendants do not argue that Janet's claim for a constructive
trust—which Janet bases on allegations of fraud and undue influence—is time-barred.
The Court therefore denies defendants' motion for summary judgment as to Janet's
undue-influence claims insofar as they relate to the townhome.

### 3.  Certificate of Deposit

Defendants move for summary judgment with respect to all of Janet's claims
relating to the transfer to Mick of $75,000 from Vivian's CD.  The only evidence
concerning this transfer is the documentation itself—namely, the CD and the check to

Vivian, which she endorsed on the back.  As discussed above, it appears that Mick cashed out the CD.  Janet does not make anything of this fact in resisting summary judgment, however.  Instead, she argues only that giving Mick the $75,000 from the CD is inconsistent with the CD's pay-on-death provision, which lists all three of Vivian's children.  As Vivian signed the check herself, however, and as Janet cites no authority for the proposition that filling out a boilerplate pay-on-death designation is sufficient to raise an issue of fact under these circumstances, this is insufficient to preclude summary judgment.

It is true that, as discussed above, a jury could find a confidential relationship between Vivian and Mick, and there are other suspicious circumstances (most notably the altered power of attorney).  Without more evidence concerning the circumstances of this transfer, however, the Court finds that this evidence is not sufficient to create an issue for trial.  *See McKinley*, 2009 WL 749306, at *3 (gifts from parent to child are presumed to be valid).  The state court's findings in connection with the appointment of a conservator in 2015 certainly indicate that Vivian was then under Mick's influence, but those proceedings are too remote in time from the cashing out of the CD in July 2009 to be of much relevance.  The Court therefore grants defendants' motion for summary judgment as to all claims relating to the CD.

-23-

4.  Parcels 3 and 4

Defendants move for summary judgment as to the August 2011 transfers of

Parcels 3 and 4.  The Court agrees with defendants that Janet has offered insufficient

evidence to allow a jury to find that Mick or Roxanne acted wrongfully with respect to

these transfers.  Vivian signed the deeds herself and, unlike the transfer of Vivian's

townhome, there is no evidence that Mick or Roxanne influenced Vivian to transfer

these parcels.  While the disposition of property is unusual, this concern is mitigated

somewhat by the undisputed fact that, at the time of these transfers, Mick's health had

significantly worsened and he was undergoing frequent, expensive medical

interventions.  Janet disputes the extent of Mick's out-of-pocket costs, but the fact

remains that Mick's severe health problems put him in a substantially different

situation from that of his siblings.

Janet points to evidence that, sometime in January or February of 2011—some six

or seven months before the transfers—Vivian told Janet that she would "never" give the

farmland to Mick.  Without any evidence concerning how Vivian came to sign the

warranty deeds, however, no reasonable factfinder could find for Janet without

resorting to speculation.  *See McKinley*, 2009 WL 749306, at *3 (gifts from parent to child

are presumed to be valid).  Vivian could have simply been trying to get Janet off of her

back, or Vivian could have changed her mind sometime after talking to Janet.  Janet also

-24-

points to her own affidavit, in which she recalls that, in May 2015, Vivian said that she did not remember signing the deeds transferring the farmland.  Janet Aff. ¶ 10.  To the extent Janet relies on these statements to prove that Vivian did not in fact intend to transfer the parcels to Mick and Roxanne in August 2011, however, they are hearsay. *See United States v. Naiden*, 424 F.3d 718, 722–23 (8th Cir. 2005) (to fall within the "state of mind" exception under Fed. R. Evid. 803(3), the statement must be contemporaneous with the declarant's then-existing state of mind).

Finally, Janet contends that the disposition of these parcels is inconsistent with Vivian's plan to divide her estate equally among her three children.  Vivian's will does not mention any specific real property, however, and the fact that her will treats her children equally in making them contingent devisees of her residuary estate is not sufficient to overcome the clear evidence of her intent as indicated by her signature on the warranty deeds.  Defendants' motion is therefore granted as to all claims relating to Parcels 3 and 4.

### 5.  Final Mortgage and Rent Payments for Parcel 2

Both sides move for summary judgment on the final rent and mortgage payments on Parcel 2.  Janet seeks judgment on her claims for (1) breach of fiduciary duty and treble damages against Mick's estate; (2) unjust enrichment against both

defendants; and (3) conversion against both defendants.  Defendants move for summary judgment on all claims relating to these payments.

As described above, in 2013, Green paid Mick a total of $225,394 that Green owed to Vivian—representing $8,894 for rent for Parcel 2 and $216,500 for the final mortgage payment on the property.  Janet argues that, even if the power of attorney granting Mick authority to make gifts to himself was valid, Mick's acceptance of this amount was a breach of fiduciary duty, as it violated the gift limit in Minn. Stat. § 523.24, subd. 8(2). The 2013 version of that provision stated as follows:

> Subd. 8.  Gift Transactions.  In the statutory short form power of attorney, the language conferring general authority with respect to gift transactions, means that the principal authorizes the attorney-in-fact:
>
> *      *      *
>
> (2) to make gifts on behalf of the principal to the principal's spouse, children, and other descendants or the spouse of any child or other descendant, and, if authorized by the principal in part Third, to the attorney-in-fact, either outright or in trust, for purposes which the attorney-in-fact deems to be in the best interest of the principal, specifically including minimization of income, estate, inheritance, or gift taxes, provided that, notwithstanding that the principal in part Third may have authorized the attorney-in-fact to transfer the principal's property to the attorney-in-fact, *no attorney-in-fact* nor anyone the attorney-in-fact has a legal obligation to support *may be the recipient of any gifts in any one calendar year which, in the aggregate, exceed $10,000 in value to each recipient[.]*

(Emphasis added.)  Janet argues that, because Mick received payments that were due to Vivian and that exceeded $10,000 in the course of one calendar year, he violated this provision and thereby breached his fiduciary duties to Vivian.

The Court was initially inclined to agree with Janet, but, after looking at the issue more closely, the Court concludes that Janet's claim suffers from a fatal flaw:  Mick did not use his authority as attorney-in-fact to make these transfers to himself.  Indeed, Mick did not transfer this money at all; instead, he was only on the "recipient" side of the transaction, in that he accepted checks that had been made out to him by a third party.  Even if Mick initially accepted these checks on behalf of Vivian—which is unclear from the record—Mick did not use his authority as her attorney-in-fact to give the money to himself.  Either Vivian orally gave the money to him (whether or not as a result of undue influence) or Mick simply stole it without Vivian's knowledge.  Either way, Mick did not use his authority as attorney-in-fact to give Vivian's money to himself.  Of course, if Mick accepted money on Vivian's behalf and then stole it—or used undue influence to keep it—Mick would have breached his fiduciary duties. Again, though, such a breach would not implicate the gift limit in subd. 8(2) because it would not involve the use of any authority as attorney-in-fact to make self-gifts.

True, the power of attorney on which Mick relied for his authority to sell the property to Green and sign the satisfaction of mortgage is the version that gave Mick

the authority to make gifts to himself. But Mick did not need (or use) that self-gifting authority when, acting as attorney in fact for Vivian, he sold the parcel to Green and then later signed the satisfaction of mortgage. The undisputed original version of the September 2004 power of attorney—which prohibited Mick from giving gifts to himself—gave Mick all of the authority that he needed to effect the sale and sign the satisfaction of mortgage. While Mick's actions as attorney-in-fact to sell the property and sign the satisfaction of mortgage are part of the overall series of events that gave rise to the final rent and mortgage payments, the fact remains that those payments came in the form of checks from a third party made out to Mick; Mick did not sign any document as attorney-in-fact that directly transferred money from Vivian to himself.

In sum, if defendants' contention that Vivian gave Mick those payments is true, then everything about this transaction could legally have occurred in exactly the same way even if Mick did not have the authority to use the power of attorney to make gifts to himself. And if defendants' contention is untrue and Mick stole the money, he did not use the self-gifting authority in the power of attorney to steal it. Either way, the gift limit in § 523.24, subd. 8(2) is inapplicable.

Admittedly, subd. 8(2) is somewhat ambiguous concerning whether it applies only to gifts that the attorney-in-fact makes to himself. The statute states that an attorney-in-fact may make gifts to himself if such gifts are authorized by the power of

attorney, "provided that, notwithstanding that the principal in part Third may have authorized the attorney-in-fact to transfer the principal's property to the attorney-in-fact, no attorney-in-fact . . . may be the recipient of any gifts" in excess of the statutory limit.  It is possible to read this language, phrased as it is in the passive voice, as broadly prohibiting the attorney-in-fact from receiving gifts in excess of the statutory limit even if he did not use the power-of-attorney to give those gifts to himself.  The Minnesota Court of Appeals has rejected such a reading of an analogous provision, however.

In *In re Will of Kipke*, the court construed § 523.24, subd. 6(3), which concerns the authority of an attorney-in-fact to designate beneficiaries for the principal's insurance policies.  645 N.W.2d 727 (Minn. Ct. App. 2002).  Like subd. 8(2), subd. 6(3) contains a passively worded limitation on the ability to designate the attorney-in-fact as a beneficiary.  *Id.* at 731.  Despite the broad phrasing of the statutory language, the court rejected the argument that the provision limited the *principal's* ability to designate the attorney-in-fact as a beneficiary.  *Id.* at 731–33.  Instead, the court held that the provision only applied to designations made by the *attorney-in-fact*, reasoning that the statute is meant to prevent self-dealing, not to limit the principal's power to act.  *Id.*

The same reasoning applies here.  Subdivision 8(2) is meant to prevent the attorney-in-fact from self-dealing, not to limit the amount that the principal may freely

choose to give to the attorney-in-fact. Therefore, subd. 8(2) does not apply unless the attorney-in-fact uses his self-gifting authority to transfer the principal's money or property to himself. The fundamental problem for Janet is that, because Mick did not use his self-gifting authority to transfer anything to himself—but instead merely accepted checks made out to him by a third party—subd. 8(2) is not implicated. The Court therefore grants summary judgment to Mick's estate on the issue of whether Mick violated subd. 8(2).

Janet argues, in the alternative, that the Court should grant summary judgment in her favor with respect to the final rent and mortgage payments because Mick used an altered power of attorney to effect them. Again, however, Mick did not make these transfers to himself and there is no dispute that he had the authority, as Vivian's attorney-in-fact, to sell the land to Green and sign the satisfaction of mortgage. The fact that the power of attorney used to effect these transactions was altered is certainly relevant to the issue of undue influence, but it does not establish as a matter of law that the transfers were illegitimate.

Moreover, defendants offer evidence that Vivian gave Mick the final mortgage payment. Janet argues that the testimony of Roxanne and her daughter Kirsten that Vivian told Mick that she wanted him to have the final mortgage payment is hearsay. "Verbal acts, however, are not hearsay because they are not assertions and not adduced

to prove the truth of the matter." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992); *see also United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003) (verbal acts are "statements that have independent legal significance, such as contractual offers or inter vivos gifts"). In addition, even if Roxanne's and Kirsten's statements were assertions being offered to prove their truth, they would nevertheless be admissible under the "state of mind" exception to the hearsay rule. *See* Fed. R. Evid. 803(3); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1312 (8th Cir. 1993) ("A declarant's out-of-court statement of intention is admissible to prove that the declarant subsequently acted in conformity with that intention, if the doing of that act is a disputed material fact." (citation and quotation marks omitted)). Janet is therefore not entitled to summary judgment in her favor as to the final rent and mortgage payments.[11]

Likewise, factual issues preclude summary judgment in defendants' favor (except that defendants are entitled to summary judgment with respect to Janet's fraudulent-inducement claim, as Janet does not identify any false representation of fact

---

[11]With regard to the rent payment, the Court notes that (1) Mick appears to have paid over only $4,894 of the 2013 rent to Vivian, *see* Hoecke Aff. Ex. 14, and (2) there appears to be no evidence as to why Mick kept $4,000 for himself. Janet does not move for judgment on the rent payment on the ground that, unlike the mortgage payment, there is no evidence that Vivian gave Mick all or even a portion of the rent payment. Nor does Janet address the significance of the $4,894 rent payment that Mick made to Vivian. Thus, while it appears to the Court that, on this record, Mick's estate is liable for the $4,000 portion of the rent payment that Mick kept for himself, the Court will not resolve this issue as it has not been adequately briefed.

upon which Vivian relied, *see Valspar Refinish, Inc.*, 764 N.W.2d at 368).[12]  Defendants

bear the burden to show that Vivian intended to give the final rent and mortgage

payments to Mick by clear and convincing evidence.  *Kiecker*, 404 N.W.2d at 883.  Unlike

the transfer of Parcels 3 and 4, here there is no signed deed or other document

establishing donative intent.  Instead, the only evidence that Vivian intended to give

Mick the final mortgage payment comes from Roxanne and Kirsten.  A factfinder could

find that this evidence falls short of clear and convincing in light of Roxanne's personal

stake in this litigation (and Kirsten's relationship to Roxanne) and in light of the

evidence of undue influence (such as the use of an altered power of attorney and the

unusual disposition of the property).  *See Nelson*, 776 N.W.2d at 452 (listing factors

indicating undue influence); *see also Bellino ex rel. Bellino v. Bellino*, No. A12-2319, 2013

WL 4045809, at *6–7 (Minn. Ct. App. Aug. 12, 2013) (trial court was free to reject

appellant's uncontradicted but improbable testimony that his parents had gifted him

most of the nearly $950,000 in a joint account).  In addition, a factfinder could infer that

Mick was stealing from Vivian from the fact that Mick gave his mother a check labeled

"2013 Rent" that was $4,000 less than the 2013 rent payment that Mick had received

from Green just a few days earlier.  Consequently, whether Vivian freely gave Mick

---

[12]The Court recognizes that the satisfaction of mortgage may well have been false, but Janet does not contend that false representations made by a defendant (Mick) to a third party (Green) that never reached the allegedly defrauded party (Vivian) are sufficient to maintain a fraudulent-inducement claim.

these payments, or whether Mick instead improperly obtained them through undue influence or outright theft, is a disputed factual issue.

Both sides also move for summary judgment on Janet's claim under Minn. Stat. § 523.22, which imposes treble damages on an attorney-in-fact who "knowingly executes a false affidavit."  Janet argues that, by signing the satisfaction of mortgage, Mick falsely represented that the debt to Vivian was extinguished.[13]  But if Vivian freely gave Mick the final mortgage payment—a disputed factual issue—then the satisfaction of mortgage was accurate.  Defendants, for their part, argue that any claim for treble damages against Mick did not survive his death.  As it is yet unclear whether Mick's estate will have any liability for the final mortgage payment, the Court need not resolve the issue of treble damages at this time.

Finally, Roxanne argues that she cannot be held liable for the final rent and mortgage payments, as they were made to Mick and there is no evidence that she had anything to do with those transfers.  She points out that the fact that the funds were

---

[13]Janet also points to the affidavit that Mick signed that was filed with the satisfaction of mortgage and that attested, among other things, that he still had power of attorney.  *See* Kvas Aff. ¶ 12 & Ex. K.  It is unclear what in this affidavit is false, however.  Janet contends that the affidavit falsely certified that the power of attorney had not been "changed, replaced, or amended," but that language appears to refer to the legal description of the relevant property, not the power of attorney.  The Court also notes that it is unclear whether § 523.22, by its terms, applies to the satisfaction of mortgage.  As the parties have not briefed these issues, however, the Court does not address them further.

deposited in a joint account is not enough to show that she had any ownership of the funds.  *See* Minn. Stat. § 524.6–203(a) ("A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."); *Enright v. Lehmann*, 735 N.W.2d 326, 328 (Minn. 2007) (holding that husband's creditor could not garnish funds in a joint account entirely funded by wife solely on the basis that the funds were in a joint account).

Roxanne's argument raises two issues:  Could a factfinder conclude that she owned at least some of the final rent and mortgage payments?  And if so, can she be held liable to Vivian's estate, at least up to the extent of the funds that she is found to have owned?

With respect to whether a factfinder could conclude that Roxanne owned at least some of the final rent and mortgage payments:  Under § 524.6–203(a), the funds in the joint account belonged to Mick alone absent clear and convincing evidence of a different intent.  Janet points to evidence that Roxanne wrote checks from the account, but Roxanne asserts that she was only added to the account because Mick was ill and she only wrote checks out of the account when Mick was in the hospital.  Roxanne Aff. ¶ 24; Roxanne Second Aff. ¶¶ 3–5.  This is a relevant factor tending to show a lack of intent to give Roxanne the funds.  *Cf. State v. Campbell*, 756 N.W.2d 263, 271 (Minn. Ct. App.

2008) ("If . . . the entry of de[cedent's son]'s name as a joint depositor was for

convenience only, so that the money might be withdrawn by the son when the father,

because of infirmity or death, could not do so, this action [by the estate for funds taken

from the joint account by decedent's son] is well brought." (quoting *Kemp v. Holz*, 183

N.W. 287, 288 (Minn. 1921))).

      At the same time, however, there is evidence that the account was used to pay

what appear to be joint household expenses.  Roxanne Aff. ¶ 24 (noting that she was

added to the account so she could "continue to pay our bills"); Roxanne Second Aff. ¶ 3

("because I was no longer working, Mick always paid the bills"); *see also* Kvas Aff. Ex. P

(spreadsheet outlining payments from account, including for mortgage, townhome

association fees, utilities, and insurance payments).  The parties have not cited, and the

Court has not found, any cases addressing whether the use of money from a joint

account to pay joint expenses evidences an intent to confer ownership on the non-

depositing joint-account holder of the funds in the account.  In the absence of any clear

guidance, the Court believes that a factfinder could find evidence of an intent to confer

ownership of the funds on Roxanne at least to the extent that the account was used to

pay joint expenses.

      With respect to whether Roxanne may be held liable:  A third party who

benefitted from another's wrongdoing may be liable to the victim for unjust

enrichment.[14]  *See Lighthouse Mgmt. Grp., Inc. v. Deutsche Bank Tr. Co. of Am.*, 380 F. Supp. 3d 911, 920 (D. Minn. 2019); *Hartford Fire Ins. Co. v. Clark*, 727 F. Supp. 2d 765, 778 (D. Minn. 2010); *but see Diversified Water Diversion, Inc. v. Hogenson Props., Ltd.*, No. A14-1519, 2015 WL 2185201, at *3 (Minn. Ct. App. May 11, 2015) (holding that plaintiff could not recover under unjust enrichment without a showing that the defendant engaged in wrongdoing in either obtaining or retaining the benefit).  Setting that aside, Roxanne was aware of the alleged gift of the final mortgage payment, as she attests that she heard Vivian make it.  *See* Roxanne Aff. ¶ 30.  Moreover, Roxanne had earlier been involved in convincing Vivian to transfer her townhome to both Mick and Roxanne; if a factfinder finds undue influence in connection with that earlier transaction, the factfinder could also infer that Roxanne was aware of any undue influence that Mick may have exerted in connection with the alleged gift of the final mortgage payment. The Court therefore denies defendants' motion with respect to the issue of Roxanne's potential liability for the final rent and mortgage payments.

---

[14]Janet contends that Roxanne may be held liable for conversion of these funds. Because the sole basis on which Janet seeks to hold Roxanne liable for these funds is that they were deposited into the joint account, however, any claim for conversion against Roxanne appears to be precluded as a matter of law.  *See TCI Bus. Cap., Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 429 (Minn. Ct. App. 2017) ("[A] conversion claim is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money.").  As the parties did not address whether commingled funds may be converted, however, the Court does not address this issue further.

6. Post-Death Transfers

Although defendants move for summary judgment on all of Janet's claims, they did not present any argument concerning the post-death transfers and, as discussed at oral argument, the Court is not aware of any theory under which these transfers were legitimate. The defendants will likely be ordered to return those payments to Vivian's estate. The Court therefore denies defendants' motion for summary judgment as to these transfers.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion for summary judgment [ECF No. 83] is GRANTED IN PART and DENIED IN PART.

    a. The motion is GRANTED with respect to the following claims:

        i. All claims relating to Parcels 1, 3, and 4.

        ii. All claims relating to the certificate of deposit.

        iii. All claims of fraudulent inducement.

        iv. The breach-of-fiduciary-duty claim against defendant Estate of Myron E. Wigen, III, insofar as that claim rests on the contention that Myron Wigen breached his fiduciary duties

by accepting transfers in 2013 in excess of the statutory limit

in Minn. Stat. § 523.24, subd. 8(2).

      b.     The motion is DENIED in all other respects.

2.     Plaintiff's motion for partial summary judgment [ECF No. 91] is DENIED.

Dated:  January 19, 2021           s/Patrick J. Schiltz               
                                           Patrick J. Schiltz
                                           United States District Judge